## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**MELINDA A. BARCLAY,**

      **Plaintiff,**

**vs.**                                        **Case No.  4:16cv603-WS/CAS**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      This is a Social Security case referred to the undersigned magistrate

judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C.

§ 405(g) for review of the final determination of the Acting Commissioner

(Commissioner) of the Social Security Administration (SSA) denying

Plaintiff's application for Supplemental Security Income (SSI) filed pursuant

to Title XVI of the Act and an application for a period of disability and

Disability Income Benefits (DIB) filed pursuant to Title II of the Social

Security Act.  After consideration of the entire record, it is recommended

that the decision of the Commissioner be affirmed.

## I. Procedural History

On September 5, 2013, Plaintiff, Melinda A. Barclay, filed applications for DIB and SSI, alleging disability beginning March 1, 2013, based on bilateral hearing loss, degenerative disc disease of the lumbar spine, gastroesophageal reflux disease (GERD), asthma, gout, hypertension, degenerative joint disease of the right hip, and bilateral carpal tunnel syndrome. Tr. 22, 319-50, 385-87, 393-401, 433-35, 462.[1]  Plaintiff last met the insured status requirements for DIB on September 30, 2015.  Tr. 22, 388.

Plaintiff's applications were denied initially on December 20, 2013, and upon reconsideration on April 4, 2014.  Tr. 22, 144-209, 226-45; *see* Tr. 388-91 (references to prior applications).  On May 8, 2014, Plaintiff requested a hearing.  Tr. 22, 246-47.  The hearing was held on February 25, 2016, before Administrative Law Judge (ALJ) David Herman in Tallahassee, Florida.[2]  Tr. 22, 45-109.  Plaintiff was represented by Pia

---

[1]  Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  At the hearing, Plaintiff's representative requested to amend Plaintiff's alleged onset date of disability from March 1, 2013, to June 1, 2014, the date Plaintiff last worked.  Tr. 22; *see* Tr. 462.  The ALJ noted that "[s]ince the proposed amendment is consistent with the overall evidence of record, the motion is granted."  *Id.*  Yet, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, since March 1, 2013, through the date of [the ALJ's] decision."  Tr. 33.

Amicone, an attorney.  Tr. 22, 45, 311.  Plaintiff testified during the hearing.

Tr. 52-88, 97-103.  Robert N. Strader, an impartial vocational expert (VE),

testified during the hearing.  Tr. 22, 88-97, 103-04, 458 (Resume).

During the hearing, Exhibits 1A through 63F were received into

evidence.  Tr. 48; *see* Tr. 35-44.  The record was held open for 20 days for

Plaintiff's representative to supply additional evidence.  Tr. 95-96, 106-07.

After the close of the hearing, on March 3, 2016, Plaintiff's counsel filed a

post-hearing memorandum, Tr. 460-61, and submitted additional exhibits,

identified in the record as Exhibits 64F through 66F.  Tr. 2030-61.  The ALJ

"reviewed and duly considered the additional evidence submitted by the

claimant post-hearing through her attorney representative (Exhibit 64F,

65F, 66F)."  Tr. 22, 44; *see* Tr. 2030-61; *see also infra* at 33-36 (discussion

of these exhibits).  On April 4, 2016, the ALJ issued a decision and denied

Plaintiff's applications for benefits concluding that Plaintiff was not disabled

from March 1, 2013, to the date of the decision.  Tr. 33-34.

On April 15, 2016, Plaintiff's representative notified Plaintiff that they

would no longer be assisting her with this matter.  Tr. 13.  On or about April

15, 2016, and May 9, 2016, Plaintiff, pro se, requested review from the

Appeals Council.  Tr. 12, 16-18.  On July 19, 2016, the Appeals Council

initially denied Plaintiff's first request for review of the ALJ's decision.  Tr. 1,

8-11.  On July 21, 2016, Plaintiff, pro se, submitted a formal request for

review of the ALJ's decision, Tr. 463, which was denied on July 27, 2016,

making the ALJ's decision the final decision of the Commissioner.[3]  Tr. 1-7;

*see* 20 C.F.R. § 404.981.

On September 30, 2016, Plaintiff, by counsel, filed a Complaint with

this Court seeking review of the ALJ's decision.  ECF No. 1.  The parties

filed memoranda of law, ECF Nos. 27 and 28, which have been

considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant meets the insured status requirements of the Social
   Security Act through September 30, 2015."  Tr. 24.

2. "The claimant has not engaged in substantial gainful activity since
   March 1, 2013, the alleged onset date."  *Id.; see supra* at n.2.

3. "The claimant has the following severe impairments: hearing loss
   in right ear, severe; hearing loss in left ear, mild; degenerative disc
   disease of the lumbar spine; gastro-esophageal reflux disease
   (GERD); asthma; gout; chronic gastritis; acute gastroenteritis;
   hypertension; degenerative joint disease in right hip, mild and
   carpal tunnel syndrome, right hand."  Tr. 24-25.  The ALJ
   considered several of Plaintiff's medically determinable

---

[3]  The Appeals Council set aside its earlier action to consider additional
information.  Tr. 1.  The Appeals Council noted, in part, that it had "looked at records
from Doctors Memorial Hospital [DMH], dated December 4, 2015 through February 2,
2016 (17 pages).  These documents are not new because they are duplicative of those
in Exhibits 62F and 64F."  Tr. 2; *see* Tr. 1970-2041.  The Appeals Council made Exhibit
16E (July 21, 2016, claimant's statement, Tr. 463) and Exhibit 67F (July 26, 2015, DMH
records, Tr. 2062-65) part of the record.  Tr. 5-6.

impairments such as morbid obesity, right foot/ankle injury and left knee/ankle injury and determined they were non-severe because they did "not meet the durational requirement, despite evidence of repeated complications associated with repairs to claimant's left leg" and there was "insufficient evidence as to whether that injury is expected to last for a continuous 12-month," although "these alleged impairments have been considered in the residual functional capacity [RFC]." Tr. 25. The ALJ considered several of Plaintiff's medically determinable mental impairments such as anxiety, depression, bipolar disorder, attention deficit hyperactivity disorder (ADHD) and obsessive-compulsive disorder (OCD), and determined they were non-severe. *Id.* In making this finding, the ALJ considered the four broad functional areas set out in the disability regulations known as the "paragraph B" criteria and determined that Plaintiff had *mild* limitation in activities of daily living, social functioning, and concentration, persistence or pace, and *no* episodes of decompensation that have been of extended duration.[4] Tr. 25-26.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 26.

5. "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she would need to use a cane or assistive device when standing or walking. She can occasionally use left foot controls. She can frequently handle and finger. She can occasionally climb ramps, stairs, ladders and scaffolds, kneel, crouch and crawl, but frequent balance and stoop. She can occasionally tolerate exposure to unprotect[ed] heights and moving mechanical parts, but can frequently be exposed to dust, odors, fumes, pulmonary irritants, extreme cold and vibration." Tr. 27; *see infra* at n.5.

---

[4] The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i). *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

6.  "The claimant is capable of performing past relevant work as a [pari-mutuel] ticket cashier.  This work does not require the performance of work-related activities precluded by the claimant's [RFC]."  Tr. 32; Tr. 89-92, 103-104.  Based on testimony from a vocational expert, Plaintiff's past work includes housekeeper, pari-mutuel ticket cashier, and cashier II, all unskilled with an SVP of 2, all light exertional as defined and performed except as a pari-mutuel ticket cashier, sedentary exertion as "actually performed."[5]  Tr. 32.

7.  The claimant was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date; has a limited education; and is able to communicate in English.  "Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled."  Tr. 32.

8.  Although the ALJ determined that Plaintiff is capable of performing her past relevant work as a pari-mutuel ticket cashier, the ALJ also determined, in the alternative at step 5 of the sequential evaluation process, that Plaintiff is capable of performing other jobs in the national economy.  The Plaintiff's ability to perform all or substantially all the requirements of a full range of light work has been impeded by additional limitations.  In

---

[5]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of 1 means "short demonstration only."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of 1 and 2.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

.

order to determine the extent to which these limitations erode the unskilled light occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with the Plaintiff's age, education, work experience, and RFC. The vocational expert testified that such an individual could perform the representative occupations such as ticket seller, ticket taker, and routing clerk, all with an SVP of 2, unskilled, and light exertion.  Tr.33; Tr. 92-93; *see supra* at n.5.  These determinations are subject to review.  *See infra* at 27-35.

9. "The claimant has not been under a disability, as defined in the Social Security Act, since March 1, 2013, through the date of [the ALJ's] decision."  *Id.*

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial

evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[6]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable

---

[6] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1505(a), 404.1509 (duration requirement).[7]

Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

---

[7]  The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

4.  Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[8]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the

---

[8]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 4041546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor").  The Court will apply the SSR in effect when the ALJ rendered her decision.  *See generally* Bagliere v. Colvin, No. 1:16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

claimant is not disabled.  If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).

An ALJ may make this determination either by applying the grids or by

obtaining the testimony of a vocational expert.  Phillips, 357 F.3d at 1239-

40; *see* 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner

carries this burden, the claimant must prove that he or she cannot perform

the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and

consequently, is responsible for producing evidence in support of her claim.

*See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.

## IV. Legal Analysis

**Substantial evidence supports the ALJ's evaluation of the medical evidence, Plaintiff's RFC, her credibility, and the vocational expert's testimony.**

I.

Plaintiff raises three issues for the Court's consideration: First, Plaintiff argues the ALJ's RFC determination that she can perform past relevant work is not supported by substantial evidence.  ECF No. 27 at 1, 15-18.  Second, Plaintiff argues the ALJ, Commissioner, and Secretary, erred in substituting their opinion for that of the vocational expert.  *Id.* at 1, 18-19.  Third, Plaintiff argues the ALJ did not properly evaluate the medical evidence and Plaintiff's credibility.  ECF No. 27 at 1, 19-21.  The Court will address the first and third issues first.

II.

Plaintiff provides a Statement of the Facts that includes references to the ALJ's findings, Plaintiff's hearing testimony, part of the vocational expert's testimony, and a summary from the ALJ's review of medical records from January 2010 until October 2014.  ECF No. 27 at 3-14.  Plaintiff refers to the ALJ's discussion of a September 23, 2013, letter from Eliot B. Sieloff, M.D., ECF No. 27 at 14, stating that Plaintiff has been unable to work since her surgery in June 2013 and it is unknown at this

time when she may be able to resume working (Exhibit 50F) [Tr. 1715-17].

The ALJ gave Dr. Sieloff's opinion "little weight because it is not supported

with an explanation and appears to cover a brief period of time."  Tr. 31.

Plaintiff also refers to a post-hearing memorandum with the amended

onset date of June 1, 2014, detailing Plaintiff's "progressive worsening

impairment with the multiple treatments and surgeries and long recovery

periods with very significant physical and mental limitations.  (R-460-

461)[.]"  ECF No. 27 at 14-15.

III.

The ALJ began his RFC analysis with a discussion of Plaintiff's

hearing testimony.  Tr. 27-28.  Plaintiff provides a summary of Plaintiff's

hearing testimony, but does not argue that the ALJ omitted relevant

testimony.  ECF No. 27 at 4-9.

> The claimant is a 46-year-old woman who testified that she
> completed the 10th grade.  She stated that she did receive a certified
> nursing assistant (CNA) specialization after her school years.  She
> testified that she lives with a friend, her friend's daughter and the
> claimant's ex-husband.  She has two children, ages 24 and 22 years
> old.  The claimant's daughter receives benefits from Social Security
> disability because of ADHD.  They do not live with her.  She testified
> that she is five feet seven inches and weighs 175 pounds.  Her
> weight has increased 10 to 15 pounds in the last three months
> before the hearing.  She alleged that she is unable to work due to
> her severe impairments.  Specifically, she testified that she cannot
> work because of the hernia sticking out of her belly for the past three
> years.  If she lifts anything over three or four pounds, it ruptures.
> She also has daily back pain which sometimes goes into her right

leg, MRSA, carpal tunnel syndrome (CTS), bulging discs, scoliosis and mental conditions that make her feel unstable. She stated that her CTS is getting worse because both her arms and hand go numb. She cannot reach for long periods of time and her arms feel very weak at times. It is hard for her to pick up a bottle of water or can of soup and she drops items. She can hold a pen to write, but not more than 30 to 45 seconds because they go numb. She is right-handed and her CTS is worse on the right. She has no insurance to get new wrist braces.

The claimant testified that she continues to have gout swelling. She has to elevate her legs and feet to help with the swelling. She sits and sleeps in a recliner. She cannot lie down flat. She was told to elevate her legs two hours at a time.

Even though the claimant has hearing loss, she testified that she does not wear hearing aids because she does not like them. She lost them about eight years ago and has not gone back to get more. She cannot hear people talking behind her or when she sleeps on her right side. She can listen to the television at a certain volume and can hear people that call her on her cell phone.

The claimant admitted that her asthma has been under control in the last four or five years. She smokes one or two cigarettes once or twice a week, but does not use alcohol or drugs.

According to the claimant, during the day, she sits around and watches about three hours of television. She watches the Soaps and takes a nap up to two hours at one time. She helps with washing dishes, picking up clothes and washing clothes. She cannot put clothes in washer or take clothes from the dryer to the couch. She cooks and with help shops, but does not sweep, mop or vacuum. She does no gardening or yard work. She goes to church every Sunday from 11 a.m. to 12 p.m. She uses a cane, but when she is going out for a while, she will use her wheel chair. She can sit for 10 minutes and then change into a different position.

The claimant testified that her medications included Allopurinol, HTCZ, Celexa, Xanax, Pepcid, Lortab, Bactrim, Albuterol and a

couple of more.   Side effects of Celexa include grogginess.   She testified that sometimes she uses over-the-counter Goodies for pain.

Tr. 27-28; Tr. 52-88 (Plaintiff's hearing testimony).[9]

The record is quite extensive and includes medical records that pre-date Plaintiff's amended alleged onset date of June 1, 2014.  *See, e.g.*, Tr. 464-1485.  The ALJ noted that "many of the opinions dated back to 2007 and severe are too remote."  Tr. 30.  Nevertheless, the ALJ summarized several opinions from 2011 and thereafter that the ALJ considered "more applicable to the time in this decision."  *Id.*  Those later opinions will be discussed herein.

The ALJ begins his discussion of the medical evidence with an August 2000 note from Plaintiff's audiologist, Selena Snowden, that Plaintiff "had mild hearing loss in her left ear and severe hearing loss in right ear."  Tr. 28.  Behind-the-ear hearing aids were recommended, bilaterally, and she received her hearing aids in September 2000.  Plaintiff's hearing loss was confirmed in January 2010 at a consultative examination by Robert M. Snider, M.D.  *Id.; see* Tr. 464-81, 807-13.

---

[9]  The ALJ also considered Plaintiff's activities of daily living, social functioning, and her concentration, persistence, or pace at step 2 of the sequential evaluation process.  Tr. 25-26; *see supra* at n.4.  The ALJ determined that his finding's regarding Plaintiff's activities of daily living and social functioning were consistent with the findings of DDS psychologists Sharon Ames-Dennard, Ph.D., and Dorothy Holmes, Ph.D.  *Id.*; *see* Tr. 146-58, 161-73, 176-91, 194-209.

January 2010 x-rays of Plaintiff's lumbar spine showed mild

degenerative changes.  Tr. 28.  August 2011 x-rays of her right foot

showed no acute findings.  November 2011 x-rays of her chest showed

positive degenerative disc disease in the spine, but no acute findings in the

chest or abdominal area.  April 2013 x-rays of her chest were negative.  *Id.*

In June 2011, Plaintiff was consultatively examined by Michael G.

Railey, Sr., Ph.D.  Tr. 30; *see* Tr. 989-92.  The ALJ made findings:

> After a mental examination, Dr. Railey concluded that the claimant
> had no diagnosis or condition.  He noted that the claimant is clinically
> stable and there were no observable mental health or relevant
> impediments to gainful employment (Exhibit 24F).  The undersigned
> gives Dr. Railey's opinion great weight because it is supported with
> explanation and relevant evidence.

Tr. 30.

Also in June 2011, Plaintiff was consultatively examined by Wayne

Sampson, M.D.  *Id.; see* Tr. 993-1003.  Plaintiff reported that she had 75%

hearing loss affecting the right ear and 45% hearing loss affecting the left

ear.  The ALJ also gave his opinion great weight:

> Upon physical examination, the claimant was full [sic] oriented and in
> no acute distress.  Her mood was within normal limits.  Her hearing
> was grossly diminished, but she was able to hear a normal
> conversation.  She was able to get up from a seated position without
> difficulty.  She was able to get on and off the exam table without
> difficulty.  Her neck and back had no tenderness or spasms.  Her
> Straight leg-raising exam was negative.  Dr. Sampson diagnosed the
> claimant with bilateral hearing loss, history of asthma/COPD (normal
> PFT on exam), history of depression and chronic abdominal

pain/vomiting (Exhibit 25F).  The undersigned gives Dr. Sampson's
opinion great weight because it is supported with explanation and
relevant evidence.

Tr. 31.

In April 2013, Plaintiff was admitted to Tallahassee Memorial Hospital

(TMH) with complaints of abdominal pain, persistent nausea, and vomiting.

Tr. 29.  In May 2013, her physical was overall normal and "Amula Konda,

M.D., noted that the claimant's current pain was out of proportion to

findings.  However, nausea and vomiting with weight loss could definitely

be from the large ulcer seen on endoscopy in April 2013.  The biopsies

were negative for malignancy."  *Id.*  Additional procedures were performed.

*Id.*  Plaintiff "was discharged in June 2013 with diagnoses of peptic ulcer

disease, intractable nausea and vomiting, gastric wall thickening, GERD,

anemia and hypotension (Exhibits 28F, 30F, 24F/17)."  *Id.*

In July 2013, Robert S. Kline, III, Psy.D., performed a consultative

examination of Plaintiff.  Tr. 31; *see* Tr. 1108-13.  Plaintiff drove herself to

the evaluation session.  She reported her hobbies include fishing, walking,

and riding a bike.  *Id.*  Plaintiff's hearing difficulty did not interfere with the

evaluation session.  She had no difficulty with basic concentration tasks

and was diagnosed with major depressive disorder, moderate, recurrent

and Dr. Kline gave her a Global Assessment of Functioning score of 60.[10]

The ALJ gave Dr. Kline's opinion "partial weight because it is not consistent

with the record as a whole."  *Id.*

In September 2013, Plaintiff returned to TMH emergency department

with complaints of abdominal pain, discomfort with associated non-bilious

non-bloody vomiting, and mild discomfort in her lower back.  Tr. 29.  In part,

"[h]er four limbs were non-deformed and had full range of motion.  She was

diagnosed with acute abdominal pain, (Exhibit 33F)."  *Id.*

---

[10]  The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the scale that is
primarily used by mental health practitioners.  The GAF Scale is used to report "the
clinician's judgment of the individual's overall level of functioning" (with regard to only
psychological, social, and occupational functioning) and "may be particularly useful in
tracking the clinical progress of individuals in global terms, using a single measure."
*See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each
with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No.
3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012)
(discussing GAF scale).  A GAF scale rating of 41-50 is indicative of serious symptoms
or any serious impairment in social, occupational or school functioning.  DSM-IV-TR 34.
A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in
social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to
endorse the GAF scale for 'use in the Social Security and SSI disability programs' and
has indicated that GAF scores have no 'direct correlation to the severity requirements of
the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir.
2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the
*Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was
recommended that the GAF be dropped from DSM-5 for several reasons, including its
conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its
descriptors) and questionable psychometrics in routine practice.  In order to provide a
global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is
included, for further study, in Section III of DSM-5 (see the chapter "Assessment
Measures")."  DSM-5 at 16; *see* Finley v. Colvin, No. 3:12-7908, 2013 WL 6384355, at
*23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the
[DSM], the GAF scale was abandoned as a measurement tool.").  *See* Tr. 31 at n.1.

The ALJ refers to Dr. Sieloff's September 23, 2013, letter noting that Plaintiff "had been unable to work since her surgery in June 2013 and it is unknown at this time when she may be able to resume working (Exhibit 50F)."[11]  Tr. 31; *see supra* at 12-13 and Tr. 1715-17.  The ALJ gave "Dr. Sieloff's opinion little weight because it is not supported with an explanation and appears to cover a brief period of time."  Tr. 31; *see infra* at n.15.

In February 2014, Plaintiff visited Cruz E. Pagan Delgado, M.D., at Tri-County Family Health.  Tr. 29; *see* Tr. 1794.  Plaintiff reported that she was no longer taking several medications, but asked for stronger medications for her back.  It was noted that she was an every day smoker. *Id.*  The ALJ made findings:

> Her physical examination was overall normal.  In the same month, she visited Doctors Memorial Hospital to discuss her G-tube removal. She reported mild abdominal problems with associated symptoms of tingling redness and drainage.  Upon physical examination, she had normal motor strength and tone.  Her joints, bones and muscles had

---

[11]  Such a conclusion of disability would not be entitled to any special weight or deference, however.  The regulations expressly exclude such a disability opinion from the definition of a medical opinion because it is an issue reserved to the Commissioner and a medical source is not given "any special significance" with respect to issues reserved to the Commissioner, such as disability.  20 C.F.R. § 404.1527(d)(1), (3); SSR 96-5p, 1996 SSR LEXIS 2, at *6 (July 2, 1996) (rescinded eff. Mar. 27, 2017).  In <u>Lewis v Callahan</u>, the court noted "that we are concerned here with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinion of the legal consequences of his condition.  Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings."  125 F.3d at 1440.

no tenderness or bony abnormalities.  She had normal movement of all extremities with no edema. Her gait and station were normal (Exhibits 40F, 55F).  The claimant underwent a Fujinon Video upper scope, which showed GERD class B, diminished LES and chronic pouch gastritis, but no ulcers or structures.  She had normal gastric bypass and anatomosis (Exhibit 40F/5).  In addition, she complained of swollen hands and feet and pain in her knees.  It appears that she was diagnosed with gout for the first time (Exhibit 55F/9).

Tr. 29; *see* Tr. 1469-70, 1473, 1478-80, 1791.  The ALJ further found:

In March 2014, the claimant visited the Tallahassee Neurological Clinic for evaluation of her low back pain.  She reported that her legs became fatigued and weak with ambulation.  She complained of leg cramps with exertion, muscle cramps, back pain, neck pain, stiffness, muscle weakness, loss of strength, poor balance and headaches.  Upon examination, her cognition was normal as well as her attention span and concentration.  Her gait, station and posture were normal.  There was no paraspinal muscle spasm.  She had normal muscle tone and strength in her upper and lower extremities.  Her straight-leg raising tests were negative, bilaterally.  CT scan of the lumbar spine showed evidence of spondylosis at L4-5, but no evidence of fracture, alignment issues for spondylolisthesis.  CT scan of the brain was normal.  X-rays of her right hip showed mild degenerative seen.  T. Adam Oliver, M.D., [a neurologist] diagnosed her with lumbar stenosis.  In April 2014, Dr. Oliver noted that the claimant's radiographic evidence does not correlate with history and physical [Tr. 1837].  He recommended pain management, physical therapy and LSO corset brace.  She had not tried conservative management for her back pain (Exhibit 56F) [Tr. 1837].

Tr. 29-30; *see* Tr. 1829-32, 1834-37.  In August 2014, Dr. Oliver diagnosed

bilateral ulnar neuropathy and carpel tunnel syndrome with tingling or

numbness in the hands.  Tr. 1850-52.  Dr. Oliver noted diminished

sensation in the fingers and 4/5 strength in the right hand.  Tr. 1852-53.

In May 2014, Plaintiff visited the DMH and reported no abdominal

pain, muscle weakness, back pain or swelling in her extremities.  Tr. 30;

*see* Tr. 1670-73.  The ALJ found:

> Upon physical examination, she was ambulating normal.  She had a
> normal psychiatric examination.  Her lungs had normal breath sounds
> and good air movement.  Her motor strength and tone were normal.
> It was noted that she had good muscle tone in her lower extremities
> and walks a lot.  Joints, bones and muscles have no tenderness or
> bony abnormalities.  She had normal movements and no edema in all
> extremities.  Her gait and station were normal (Exhibit 48F)
> [Tr. 1672].

Tr. 30.

> The ALJ summarized several of the notes from 2014 and 2015:

> In June 2014, the claimant had positive Tinel's sign in her right elbow
> and wrist.  In August 2014, an EMG/NCV study showed moderate to
> severe bilateral ulnar nerve lesions (Exhibit 56 F/15, 20) [Tr. 1841,
> 1846].[12]

> In July 2014, a sinogram of the abdomen showed chronic wound with
> intermittent drainage, no fistula.  She had a large midline ventral
> hernia, but no obstruction or strangulation.  In September 2014, she
> was assessed with MRSA (Exhibit 52F/3, 57F/10) [Tr. 1734, 1863].

> In October 2014, Roy I. Schwartz, M.D.[,] stated that he informed the
> claimant that smoking is certainly not helping any of her conditions.
> He would try her on Doxycycline for three weeks and then send her to
> Shands to undergo a gastric bypass revision versus her sinus fistula
> tract versus her recurrent incisional [herniorrhaphy] with mesh
> (Exhibit 47F-7, 8) [Tr. 1643-44].

---

12  As noted above, Plaintiff amended her alleged onset date to June 1, 2014.
Tr. 30.

In May 2015, it was noted that the claimant needed to cease smoking in order to completed [sic] proper evaluation of her persistent fistula and incisional hernia.  It was stated that her symptoms and inability to properly heal from previous surgeries [were] due to her smoking habits (Exhibit 47F, 25) [Tr. 1661].  The undersigned notes that the claimant testified that she quit smoking, but continues to smoke one or two cigarettes a week or every two weeks.

In July 2015, x-rays of her cervical spine showed no evidence of cervical spine fracture.  X-rays of her lumbar spine showed no fractures, but there are minimal unchanged anterolisthesis of L4 with respect to L5 (Exhibit 62F) [Tr. 2005-06].

Tr. 30.

Toward the end of the ALJ's analysis of Plaintiff's RFC, the ALJ summarizes reports from three State Agency consultants, including psychologists, Sharon Ames-Dennard, Ph.D., and Dorothy Holmes, Ph.D., who provided psychological evaluations on December 20, 2013, and a medical consultant, Efren Baltazar, M.D., who provided a physical RFC assessment at the reconsideration level.  Tr. 31; *see* Tr. 146-58, 161-73, 176-91, 194-209.  The ALJ gave "partial weight" to Dr. Baltazar's opinion "because he is limited to review available records only" and gave "little weight" to the opinions of Drs. Ames-Dennard and Holmes because they were not "consistent with the record as a whole."[13]  *Id.; but see* Tr. 25-26.

---

[13]  Although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a state agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review.  *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p eff. Mar. 27, 2017).

As the finder of fact, the ALJ is charged with the duty to evaluate all the medical opinions of the record and resolve conflicts that might appear. 20 C.F.R. § 404.1527.[14]  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 404.1527(b) & (c)(1)-(6).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical

---

The findings of State agency medical consultant may provide additional evidence to support the ALJ's findings.  *See* Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).

[14]  This provision applies to claims filed before March 27, 2017.  For claims filed after that date, section 404.1520c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

professionals most able to provide a detailed, longitudinal picture of your

medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative

examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This

requires a relationship of both duration and frequency."  Doyal v. Barnhart,

331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating

physician must be supported by substantial evidence, Marbury v. Sullivan,

957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.

Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is

given to a treating physician's opinion and any reason for giving it no

weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at

1053.

The ALJ may discount the treating physician's opinion if good cause

exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).

Good cause may be found when the opinion is "not bolstered by the

evidence," the evidence "supported a contrary finding," the opinion is

"conclusory or inconsistent with [the treating physician's own medical

records," the statement "contains no [supporting] clinical data or

information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Further, opinions on some issues, such as whether the claimant is unable to work, the claimant's RFC, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of the case; i.e., that would direct the determination or decision of disability."  20 C.F.R. § 404.1527(d); see Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986).  "[T]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (July 2, 1996) (rescinded eff. Mar. 27, 2017).  Although physician's opinions about what a claimant can still do or the claimant's restrictions are relevant evidence,

such opinions are not determinative because the ALJ has responsibility of assessing the claimant's RFC.

Aside from Dr. Sieloff's cryptic September 23, 2013, letter,[15] Tr. 31, no treating physician opined that Plaintiff's carpal tunnel syndrome and ability to "finger" or necessity to elevate her legs are of such severity as to preclude her from working in any capacity.  Substantial evidence supports the ALJ's consideration of the medical evidence of record.

Further, the ALJ properly determined that the medical evidence did not support Plaintiff's assessment of her inability to work due to her severe impairments.[16]  Plaintiff's physical examinations from on or about

---

[15]  An ALJ may reject an opinion that is so brief and conclusory that it lacks persuasive weight or is unsubstantiated by any clinical or laboratory findings.  Phillips v. Barnhart, 357 F.3d at 1240-41. It appears Plaintiff first visited with Dr. Sieloff on May 7, 2013, for an "[e]xploratory laparotomy" Tr. 1781, followed by an endoscopy on July 22, 2013, Tr. 1265-66, 1779, and follow-up visits in August through October, 2013, Tr. 1767-71, pertaining to problems associated with a feeding tube.  Dr. Sieloff's opinion regarding Plaintiff's inability to work, Tr. 1717, appears appropriate considering Plaintiff's problems at this time, but does not serve as substantial evidence to support a disability determination.

[16]  The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.  See Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  See Wilson v. Barnhart, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  Id.  Subjective symptoms can be overstated, so a claimant's subjective allegations of pain or other symptoms alone will not establish that

September 2013 at TMH, the February 2014 visit with Dr. Delgado, and the

March 2014 visit at TNC reveal rather normal or benign physical findings.

Tr. 29-30.  In May 2014, Plaintiff was "ambulating normally" when visiting

DMH.  Tr. 30.  In June and August 2014, Plaintiff had positive findings

regarding right elbow and wrist and ulnar nerves, but not repeated

problems.  Tr. 30-31.

Overall, substantial evidence supports the ALJ's RFC assessment

that Plaintiff can perform light work with exceptions.  Tr. 27.

IV.

Closely allied with points one and three, Plaintiff argues the ALJ,

Commissioner, and Secretary, erred in substituting their opinion for that of

the vocational expert.  ECF No. 27 at 18-19.

The ALJ provided a brief roadmap prior to asking the vocational

expert five hypothetical questions.  Tr. 89-104.

> Because of the range of -- in a variety of conditions.  So, I'm going --
> the first is based off of -- the first hypothetical in her records is based
> off of the review of Social Security Administration.  The second adds
> the carpal tunnel.  The third as the left knee.  And the fourth is based
> upon her testimony here today.

T. 89.

_____

she is disabled.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1528(a), 404.1529(a).

The ALJ first asked the vocational expert to assume a hypothetical person of Plaintiff's age, education, and with the past jobs (*e.g.*, pari-mutuel ticket cashier) with the following limitations:

> [T]he range of light exertional level as defined in the regulations. In addition, the person could frequently climb ramps and stairs, ladders, and scaffolds, balance, stoop, crouch, and crawl. All frequent. The person's hearing is limited to the extent that you hear a normal conversation. For environmental limitations, the person could frequently tolerate exposure to unprotected heights, moving mechanical parts, dust, odors, fumes, and pulmonary irritants, extreme cold, and vibration.

Tr. 90. The vocational expert opined that such a hypothetical person could perform Plaintiff's past work as a housekeeper, pari-mutuel ticket cashier, and cashier II. *Id.*; *see* Tr. 32, 89.

For the second hypothetical, the vocational expert was asked to

> assume an individual who have all the same limitations as the first hypothetical. But please and in the following manipulative limitations. The person could only handle frequently with both left and right hand, and finger frequently with the left and right fingers.

Tr. 90-91. In response, the vocational expert opined that such a person could perform the three jobs referenced above. Tr. 91.

For the third hypothetical, the vocational expert was asked to

> assume, again, all the same limitations as previously discussed in both the first and second hypothetical, with the following additional limitations relating to her left leg impairments. The individual would need to use a cane or assistive device when standing or walking. The person would only occasionally be able to use left foot controls. The person could only occasionally climb ramps and stairs, ladders

and scaffolds, kneel, crouch, and crawl.  And could only occasionally
tolerate exposure to unprotected heights, moving mechanical parts.

Tr. 91.  The vocational expert opined that the hypothetical person could

perform the job as a pari-mutuel ticket cashier "as performed," and opined

that the hypothetical individual could perform other work in the national

economy as a ticket seller, ticket taker, and "may be a routing clerk."

Tr. 92; *see* Tr. 33.

The ALJ's RFC determination is primarily based on the facts

considered in the three hypotheticals mentioned above.  Tr. 27 (RFC

determination); *see supra* at 5, ¶ 5 (same); *see also* Tr. 103-04.

For the fourth hypothetical, the vocational expert was asked to

assume an individual with all the same limitations as we discussed all
added together, the first through the third hypotheticals.  But, in
addition, please reduce the exertional level to the range of sedentary
work as defined in the regulations.  In addition, the person would
need to be able to change position as needed to sitting, standing, and
walking at their option.  But they could not sit, stand, or walk any
more than 30 minutes without an interruption.  *The person would also
need to elevate their legs -- for their left leg above their heart for two
hours at a time at least once per day while working.*  The -- in
addition, the person would be limited to reaching overhead to
frequent reaching both right and left, as well as in all other directions.
So, frequent reaching in all directions and overhead.  *The person
would also have occasional feeling with their fingers, left and right.*
The person could never tolerate exposure to -- excuse me.  Never
climb ladders and scaffolds.  Only occasionally balance, occasionally
stoop, and never crawl.  And the person could never tolerate
exposure to unprotected heights.  And would be limited to performing
simple and routine tasks with regard to understanding, remembering,
and carrying out instructions.

Tr. 93 (emphasis added). The vocational expert opined that the hypothetical individual could not perform any of the past prior work previously described. The vocational expert stated that, as "the main thing," "[e]levation would preclude all jobs." Tr. 93-94. Also, the hypothetical individual could not perform any other work in the national economy because of "[e]levation." Tr. 94. If leg elevation were removed from the hypothetical, there would be "very minimal" work that could be performed in the national economy. *Id.* Similarly, if elevation of the leg were removed from the hypothetical, a person "would need more than occasional feeling" to perform past work as a pari-mutuel ticket cashier.[17] *Id.*

It appears Plaintiff's main argument is that the ALJ erred in determining that she is capable of performing her past relevant work as a pari-mutuel ticket cashier because the vocational expert testified, in response to the fourth and fifth hypothetical questions, that the need for "fingering" would preclude such a job and also that the need for Plaintiff to elevate her right leg for two hours at a time would preclude all jobs in the national economy, based on the vocational expert's responses, Tr. 92-95.

---

[17]  The vocational expert testified that his testimony was consistent with the DOT. Tr. 91-94.

*See* ECF No. 27 at 19.  In other words, Plaintiff argues that she is not able to perform light, unskilled work because she is not able to perform the amount of fingering required and must elevate her leg, which would preclude any work.

Later in the hearing, the ALJ returned to the fourth hypothetical question and asked the vocational expert to "remove the elevation requirement" and "reduce the feeling requirement for fingering to frequent with both the left and right fingers.  Tr. 103.  The vocational expert opined that the hypothetical person (Plaintiff) ("for hypo number five") could perform her previous work as a pari-mutuel ticket cashier and could perform other unskilled work (sedentary addresser, document preparer, and may be a call-out operator) if these requirements were removed from consideration.  Tr. 103-04.  The ALJ did not rely on these jobs.  Tr. 32-33.

Prior to Plaintiff's counsel questioning the vocational expert, the ALJ mentioned that elevation of the leg and issues related to feeling, which precluded work, were not specifically reflected in the medical record and, as a result, the ALJ stated that it might be necessary to request Plaintiff, if she were willing, to attend a consultative examination.  Tr. 95.  Plaintiff testified that there might be records from Dr. Oliver of Tallahassee Neurological Associates pertaining to medical treatment of her legs and

CTS.[18]  Tr. 95-96; *see* Tr. 98-99 (Plaintiff was questioned regarding her examination with Dr. Oliver).  The ALJ gave counsel additional time to supplement the record with additional records, if they exist.  Tr. 96.

Counsel then inquired of the vocational expert who testified that a claimant who would be absent from work for two days per month or off-task for 20% of a workday in addition to customary breaks, would be precluded from any kind of work.  Tr. 96-97.

Toward the end of the hearing, the ALJ inquired further of the vocational expert and, regarding the last (perhaps the fifth and not fourth when read in context) hypothetical, the ALJ removed the elevation requirement and reduced the feeling requirement for fingering to frequent with both the left and right fingers, retaining all the same limitations as discussed prior with respect to hypothetical four.  Tr. 103.  The ALJ asked "[c]ould the hypothetical person for hypo number five perform the past job as a [pari-mutuel] ticket cashier?" to which the vocational expert stated, "[y]es."  *Id.*  The individual could also perform other work such as sedentary addresser, unskilled with an SVP of 2; document preparer, unskilled with an SVP of 2, and call-out operator, unskilled with an SVP of 2.  Tr. 103-04.

---

[18]  The ALJ referred to Dr. Oliver's examination of Plaintiff in 2014.  Tr. 29-30; *see supra* at 20.

The hearing continued.  It appears that Plaintiff had an appointment in March after the hearing, *see infra* at n.19, with a doctor who would be evaluating her lower extremity and counsel advised the ALJ that he would try to get something in writing.  Tr. 104.  The ALJ decided again to give counsel additional time to get more documentation to help support Plaintiff's allegations.  *Id.*  This is especially so if there has been additional work on Plaintiff's leg and removal of another screw.  Tr. 104-05.  The ALJ also stated that he would allow more time for counsel to get an opinion of Plaintiff's functional capacity.  Tr. 105.  The ALJ concluded the hearing giving Plaintiff's counsel 20 days to supplement the record with additional records to support Plaintiff's allegations of disability. Tr. 106.

V.

After the hearing, on March 3, 2016, Plaintiff's counsel sent the ALJ medical records from DMH from December 15, 2015, through February 2, 2016, Tr. 2042-45 (Exhibit 64F); office treatment records from Madison Family Clinic from January 6, 2016, through February 11, 2016, Tr. 2042-45 (Exhibit 65F); and office treatment records from Tallahassee Orthopedic

Clinic (TOC) from October 26, 2015, through March 3, 2016, Tr. 2046-61 (Exhibit 66F).[19]

These medical records pertain to either Plaintiff's complaint of left knee and ankle pain, *see, e.g.*, Tr. 2033-34, 2039-40, or left leg tibial pain, *see, e.g.*, Tr. 2041, 2048-65.

On October 26, 2015, Plaintiff was admitted to DMH for a left tibial deep hardware removal (a proximal screw from left tibia was removed). Tr. 2059-60; *see* Tr. 2056-58 (follow-up visit with TOC on Nov. 10, 2015).[20] A patient note from TOC of December 14, 2015, indicates that Plaintiff followed up with TOC after a screw was removed three weeks prior. She continued to complain of significant amount of pain throughout the whole knee. The left lower leg examination revealed that her lower extremities and all the skin incisions were hundred percent healed and she had positive palpation of the whole entire leg. It is further noted that "[s]he does have full range of motion of the ankle. Positive dorsalis pedis pulse. There is no intact sensation to light touch. Full range of motion at the knee."

---

[19]  On March 3, 2016, Plaintiff was seen by Mary Strange, ARNP-C, at TOC, to re-check her lower leg (onset date of July 18, 2015). Tr. 2048. Medications are noted. *Id.* There are no treatment notes. *Id.*

[20]  On July 20, 2015, Plaintiff fractured her left leg in a car accident and underwent surgical fixation. Tr. 1601-03. In October 2015, Plaintiff underwent removal of hardware. Tr. 1601-06. It was noted Plaintiff needed a cane for ambulation. Tr. 1602.

Tr. 2052.  Exhibit 67F is a four-page record from DMH for July 22, 2015,

which, in part, shows a picture of a tibial and fibular fracture, adult.

Tr. 2062-65.

Patient notes from TOC dated January 12, 2016, indicate that Plaintiff

complained of left leg pain.  Tr. 2050.  After the car accident, Plaintiff was

subsequently seen by a physician for ongoing pain to her left knee and for

removal of a loose screw which was three months post-op at the time of

this office visit.  *Id*.  Plaintiff visited with TOC on that date and continued to

complain of pain to her left knee.  *Id*.  Plaintiff reported that she had had

multiple surgeries by Dr. Sieloff and was on chronic antibiotics for a MRSA

infection to her abdominal wall.  *Id*.  Plaintiff was oriented to time, place,

and person, and her mood and affect were appropriate.  Tr. 2051.  The

lower left leg examination stated in part that Plaintiff had full range of

motion to the knee and was "[a]ble to DF/PF ankle and wiggle toes without

difficulty.  NVI distally with soft compartments."  *Id.*  "The remainder of the

musculoskeletal exam does not reveal any significant abnormalities."  *Id.*

"Tibia Xrays: AP and lateral views of left tibia and fibula demonstrate a

healed fibula fracture with a delayed union to her tibia with minimal

progression of callous formation."  *Id.*  A treatment plan was explained to

Plaintiff.  *Id.*

As noted above, the ALJ "reviewed and duly considered" these records, Exhibits 64F through 66F.  Tr. 22.  No treating physician provided an analysis of Plaintiff's ability to function, except for Dr. Sieloff's opinion limited in time.

VI.

Substantial evidence supports the ALJ's RFC determination and reliance on that portion of the vocational expert's testimony that supported the ALJ's finding that Plaintiff could perform previous work and other jobs in the national economy notwithstanding Plaintiff's assertion that she is precluded from work based on her need to elevate her leg and problems with fingering.  No error has been shown.

## VI.  Conclusion

Considering the record as a whole, the ALJ's findings are based upon substantial evidence in the record and the ALJ correctly applied the law. Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED** and Judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on January 22, 2018.

**s/ Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.